# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 25, 2025 Session

## STATE OF TENNESSEE v. ROBERT OLIVER

**Appeal from the Criminal Court for Washington County**
**No. 44567      Lisa Rice, Judge**

**No. E2023-01623-CCA-R3-CD**

FILED

APR 4 2025

Clerk of the Appellate Courts
Rec'd by

The Defendant, Robert Oliver, was convicted by a Washington County jury of aggravated rape and aggravated assault, for which he received an effective sentence of twenty-eight years' incarceration. On appeal, the Defendant argues that (1) the evidence adduced at trial was insufficient to support his conviction of aggravated rape, (2) the State committed prosecutorial misconduct during closing arguments, and (3) the trial court erred by ordering the Defendant to pay $60,000 in fines. Following our review, we conclude that the trial court failed to make appropriate findings regarding its imposition of fines. Therefore, we reverse the trial court's sentencing determination regarding the fines and remand this case for further proceedings consistent with this opinion. We otherwise affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right;**
**Judgments of the Criminal Court Affirmed in Part, Reversed in Part;**
**Case Remanded**

W. MARK WARD, SP. J., delivered the opinion of the court, in which TIMOTHY L. EASTER and MATTHEW J. WILSON, JJ., joined.

Brennan M. Wingerter, Assistant Public Defender – Appellate Director, Tennessee District Public Defenders Conference (on appeal); Jeff Kelly, District Public Defender; Akiah Highsmith, Johnson City, Tennessee (at motion for new trial and sentencing hearings); and William C. Donaldson, Assistant District Public Defender (at trial), for the appellant, Robert Oliver.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Steve Finney, District Attorney General; and Robin Ray, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual and Procedural History

On January 10, 2019, a Washington County grand jury returned a two-count indictment charging the Defendant with the aggravated kidnapping and aggravated rape of the victim, C.H.[1] Following pretrial hearings, a Washington County grand jury charged the Defendant in a superseding indictment with aggravated rape and aggravated assault on January 7, 2020. The Defendant's trial commenced on August 5, 2021.

### A. Trial

#### 1. The Victim's Interview

Johnson City Police Department ("JCPD") Investigator Brady Higgins testified that on August 1, 2018, he was dispatched to interview the victim at Franklin Woods Hospital regarding a possible "domestic altercation." Investigator Higgins spoke with the victim's nurses before interviewing the victim and learned that the victim had been admitted complaining of pain in her neck, back, and ribs following a possible sexual assault. When Investigator Higgins entered the victim's hospital room, he saw that she wore a neck brace and had bruises on her arms and knees.

The victim told Investigator Higgins that she and her boyfriend, the Defendant, had rented a room at the Super 8 motel in Johnson City on July 27, 2018. There, the couple had consensual sex before getting into a "disagreement." The victim attempted to leave the motel room during the argument, but the Defendant grabbed her from behind and began choking her. The victim lost and regained consciousness several times. The first two times she awoke, she found the Defendant "on top of her" and holding his hand against her throat. The third time she regained consciousness, she attempted to fight against the Defendant, but the Defendant instructed her to "quit moving" and stated that he "wasn't done pissing in her." The victim again lost consciousness, and when she awoke, she found herself "lying in the floor in her own feces."

The Defendant instructed the victim to take a shower, and afterwards, the two went to the mall together. The victim told the Defendant that she had been receiving text messages from her daughter and needed to leave. The Defendant permitted the victim to leave but instructed her to return to pick him up from the mall. When the victim did not do so, the Defendant began sending her text messages.

---

[1] It is the policy of this Court to refer to the victims of sexual offenses by their initials to protect their privacy.

Following her interview with Investigator Higgins, the victim wrote and signed a statement summarizing her allegations. Investigator Higgins also took photographs of the victim's injuries, which were introduced into evidence along with the victim's statement. From these photographs, Investigator Higgins identified bruising on the victim's arms near her biceps, knees, the inside of her left thigh, and on the backside of her left leg near her buttocks and hamstrings.

On cross-examination, Investigator Higgins testified that he took notes while he interviewed the victim. He agreed that he did not specifically write that the victim said she had been raped but instead "documented how she said that it occurred." He further recalled that the victim stated that she first had consensual sex with the Defendant followed by nonconsensual sex.

## 2. The Victim's Statement

In her written statement, the victim recalled that she and the Defendant drove around town together prior to renting a room at the Super 8 motel. During their drive, the victim was twice pulled over because her vehicle's taillights were out. The victim and the Defendant drove to Advance Auto Parts, where the Defendant attempted to fix her brake lights, and then the Defendant instructed the victim to take him to the Super 8 motel. The victim placed the reservation under her name, and the Defendant paid for the room.

While at the Super 8 motel, the victim and the Defendant had consensual sex several times. Afterwards, the victim fell asleep, only to be awakened by the Defendant telling her that she was "crazy." The victim attempted to leave the motel room during the ensuing argument, but the Defendant "came up behind [her] and choked [her] out." The victim lost consciousness. When the victim awoke, she began crying, at which point the Defendant "got on top of [her] and pushed on [her] mouth and neck," telling the victim that he would kill her if she cried. The victim lost consciousness again, and when she awoke, she attempted to fight the Defendant. In response, the Defendant "threw [her] on the floor and got back on top of [her]" and "continued screwing" the victim until she again lost consciousness. When she awoke, the victim found herself on the bed. The Defendant told her not to move and that "he wasn't done pissing in" her. The victim lost consciousness and awoke on the floor, lying halfway under the bed in her urine and feces.

Shortly afterwards, "room service" called the motel room, and the Defendant instructed the victim to take a shower. Once clean, the victim drove the Defendant to the Red Lobster parking lot, where he gave her a shirt to wear and Ibuprofen to ease the pain from her injuries. He instructed the victim not to cry and warned that if she "didn't start looking happy," he would "do it worse." The Defendant also told the victim that he loved her and instructed her to hold his hand while they walked around the mall.

### 3. The Victim's Testimony

The victim testified that she and the Defendant were high school friends who had rekindled their friendship in 2018 via Facebook. The two began dating that same year. On July 27, 2018, after spending a night together sleeping in the victim's vehicle, the victim and the Defendant decided to rent a room at the Super 8 motel. The Defendant complained that the first room he and the victim were provided was not cold enough, so they were relocated to a different room. The victim and the Defendant later left the motel to purchase dinner and whiskey, which they ate and drank in their motel room. After she and the Defendant had consensual sex, the victim fell asleep. When she awoke later in the evening, she saw that the Defendant had finished the bottle of whiskey. The victim and the Defendant again had consensual sex but soon began arguing after the Defendant "said something" to the victim.

The victim threatened to leave the motel during the argument, and the Defendant responded that he would remove the tires from her vehicle to prevent her from doing so. When the victim began dressing herself, the Defendant grabbed her from behind and lifted her off the ground. The Defendant then choked the victim, and the victim felt "things popping" in her back and neck before losing consciousness. The victim awoke on the floor and attempted to scream for help, but the Defendant grabbed her by her hair, pushed her head back, and covered her mouth with his hand. The Defendant pushed the victim onto her back, moved her near the bed, and told her to be quiet. He then pressed his forearm against the victim's throat, knelt on top of her, and removed her pants. The victim attempted to push the Defendant away from her, to which the Defendant responded by punching her in the face. He then pressed his fingers into her thighs, punched her in the ribs, "body-slam[med]" her into the floor, and flipped her onto her stomach. The victim recalled that her teeth hit the floor and that her nails bent backwards as she struggled against the Defendant. The Defendant then picked the victim up, placed her on the bed, and pressed her face into the mattress. The victim struggled to breathe and again lost consciousness.

When the victim awoke, she found the Defendant holding her on the bed. The victim attempted to struggle away from the Defendant, but the Defendant held her down, squeezed her thigh, and stated, "Don't move. I'm not done pissing in you yet." The victim recalled that the Defendant was "inside" her "at some point." Afterwards, the Defendant lifted the victim off the bed and "slammed" her against the floor twice. The victim lost consciousness again, and when she awoke, she found that she had "used the bathroom all over [herself]." The Defendant told the victim she could leave. The victim collected her clothing and her cell phone and went to take a shower. When the Defendant noticed that the victim's cell phone was missing, he forced his way into the bathroom and began "tearing the place apart" until he discovered that the victim had hidden it under a towel. The Defendant instructed the victim to take a shower, "to look nice," and to "cover up all the marks."

Later, the Defendant instructed the victim to drive him to the Red Lobster located near the mall. The victim recalled that she wore a hooded sweatshirt to cover her injuries, but when she parked her vehicle, the Defendant told her to remove it and to wear a white T-shirt he gave her instead. The Defendant also gave the victim Ibuprofen for her injuries.

The victim and the Defendant walked around the mall, and the victim recalled that she wore a skirt and the white T-shirt the Defendant gave her. The victim stated that all her injuries were visible while she and the Defendant walked around the mall, and that the Defendant told her that no one would help her. Afterwards, the victim and the Defendant returned to the victim's vehicle, where the victim told the Defendant that R.O.,[2] her ex-mother-in-law, had recently sent her a text message stating that her son was at R.O.'s house. While the Defendant searched for his wallet in the trunk of the victim's vehicle, the victim sent a text message to R.O. asking her to reply with a message stating that her son needed her. She also asked her not to "let him know that I just messaged you," and deleted her text messages to R.O. from her phone. R.O. did as the victim asked, and the Defendant eventually returned to the vehicle. The victim told the Defendant that her son needed her, and the Defendant responded that she could visit her son at R.O.'s home. However, he instructed her to return to pick him up from the mall in two hours.

The victim drove to R.O.'s home, where she found R.O., R.O.'s friend, and the victim's son, daughters, and ex-husband already present. The victim spent the night at R.O.'s home and did not return to the mall. The victim recalled that she was unable to sleep and attempted suicide the first night after her assault. Though the victim's children encouraged her to get treatment for her injuries, the victim refused to do so because she was frightened of the Defendant. The victim remained at R.O.'s home for several days, during which time she began speaking with the Defendant through text messages. The victim testified that in one exchange, she told the Defendant that he had badly injured her, to which the Defendant responded, "At least I didn't do it in your butt the whole time." The victim ultimately allowed her daughter and her daughter's boyfriend to take her to the hospital several days after her assault.

The victim testified that she had undergone "a lot of therapy" to try to understand her rape and assault. She also explained that she was unable to recall the specifics of what the Defendant had done to her during the days immediately following her rape and assault, which she stated was the reason for any inconsistencies between her trial testimony, her interview, and her statement to Investigator Higgins.

---

[2] In an effort to further protect the victim's privacy, we will refer to members of her extended family by their initials, as well.

On cross-examination, the victim agreed that her description of her rape and assault during her interview with Investigator Higgins and in her written statement was not as specific as her trial testimony. She specifically noted that she had not previously mentioned that the Defendant grabbed her hair, placed his knees on her body, dragged her to the middle of the floor of the motel room, slammed her onto the floor, or that she took her cell phone into the bathroom with her. She explained that she had been unable to recall these details in the days immediately following her rape and assault and that she had undergone extensive therapy to better understand the incident in the years since. A copy of the receipt from the Super 8 motel was introduced through the victim's testimony, which stated that she had reserved a room and later been assigned to Room 121 for one night on July 27, 2018.

### 4. Officer Richardson's Testimony

Former JCPD Officer Bret Richardson testified that he assisted Investigator Higgins in interviewing the victim on August 1, 2018. He recalled that the victim was "very upset, crying, and withdrawn" during her interview. He noted that she had several visible injuries which he believed to be consistent with her statement.

On August 3, 2018, Officer Richardson visited the Super 8 motel and found the Defendant in Room 121. He later interviewed the Defendant. Officer Richardson recalled that the Defendant waived his Miranda rights and stated that he and the victim had spent the night at the Super 8 motel, where they had consensual sex. The Defendant and the victim later got into an argument that devolved into a physical fight. The Defendant stated that the victim "struck him in the head area while he was sitting on the bed" and that he responded by grabbing the victim and squeezing his arms around her to restrain her. He stated that the victim later complained that her back and neck were sore.

Officer Richardson recalled that the Defendant gave a description of the injuries and bruises the victim sustained during their fight. Officer Richardson testified that this description was not consistent with the victim's injuries on August 1, 2018. He also recalled that the Defendant consented to a search of his cell phone and that detectives were unable to recover anything from the device.

On cross-examination, Officer Richardson testified that the victim told him she was afraid of the Defendant because he sent her threatening text messages following her rape and assault. The victim later provided records of these text messages, which Officer Richardson reviewed and described as non-threatening. He also recalled that officers were unable to locate the victim prior to the Defendant's preliminary hearing and were unsure of whether she would testify, but she ultimately did so.

### 5. The Defendant's Interview

A recording of the Defendant's August 3, 2018 interview with Officer Richardson was played for the jury. In the interview, the Defendant stated that he and the victim rented a room at the Super 8 motel on the previous Friday night. While there, he and the victim had consensual sex and drank whiskey. The Defendant stated that he and the victim fought "every time we drink," and that they soon got into an argument that devolved into a physical fight when the victim hit the Defendant in his head. To restrain the victim, the Defendant wrapped his arms around her and squeezed until she agreed that she had calmed down. When the Defendant released the victim, the victim began hitting him again, so the Defendant again squeezed his arms around her. In doing so, the Defendant inadvertently choked the victim. The Defendant averred that he did not realize the victim was unable to breathe until she began "claw[ing]" at his arm. The Defendant stated he promptly released the victim. He explained that this mistake was due to the victim's being a "small" and "skinny" person. He recalled that the victim later complained that her neck and back hurt and developed a "red mark" on her neck.

After their fight, the Defendant and victim went to sleep. When they awoke, they again had consensual sex and left the motel room. The victim parked her vehicle in the Red Lobster parking lot, and the two walked around the nearby mall for a short time until the victim received a text message informing her that her son would soon be visiting R.O.'s home. The victim told the Defendant that she would leave, visit her son, and return later to collect him from the mall. The Defendant waited several hours for the victim to return, and when she did not, he called Lacy Barnett, who he described as another of his girlfriends, to ask her to pick him up. Shortly after Ms. Barnett collected the Defendant from the mall, the victim texted the Defendant to ask where he was, telling him that she was worried for him and had been driving around to try to find him. The Defendant ignored these text messages and spent the night at the Quality Inn with Ms. Barnett. The next day, the Defendant and Ms. Barnett rented a room at the Super 8 motel, where they were coincidentally assigned Room 121.

The Defendant denied that he raped the victim or that he picked her up and slammed her against the floor at any time during their fight. The Defendant also denied that the victim lost consciousness during their fight. He noted that he once attempted to initiate sex with the victim during their stay at the Super 8 motel but stopped these attempts when the victim stated she did not wish to have sex again. He stated that he believed that "everything was fine" between himself and the victim following their stay at the Super 8 motel until the victim sent him a text message stating that she wished to end their relationship. Several days later, the victim reversed course, telling the Defendant she wished to mend their relationship.

The State rested. Following a <u>Momon</u> colloquy, the Defendant elected to testify.

### 6. The Defendant's Proof

The Defendant testified that he and the victim first met while attending high school in Hawaii. Years later, they reconnected and began dating. During their relationship, the Defendant purchased a cell phone for the victim but took it back from her when they broke up. Several days before July 27, 2018, the victim sent a text message from R.O.'s cell phone asking to have her cell phone back. The Defendant told the victim that he was staying at the Quality Inn, and the victim visited him and spent the next three nights with the Defendant there. On July 26, 2018, the Defendant and the victim left the Quality Inn and drove to R.O.'s home. While there, the victim and R.O. began arguing, and the victim and the Defendant ultimately left R.O.'s home to sleep in the victim's vehicle.

On July 27, 2018, the Defendant and the victim reserved a room at the Super 8 motel. As they could not immediately check into their room, they drove to a nearby laundromat and washed their clothes. The Defendant recalled that the victim was pulled over twice because one of her taillights was out.

The Defendant testified that he and the victim were initially assigned a room on the second floor of the Super 8 motel. Upon realizing that the air conditioner in this room was not functional, the Defendant requested to move, and he and the victim were reassigned to Room 121. The victim took a shower and napped, and then she and the Defendant left to purchase dinner and whiskey, which they ate and drank in their motel room. While drinking, the victim and the Defendant watched videos on the Defendant's cell phone, including one discussing "people cheating on their boyfriends and girlfriends." This video prompted the Defendant to ask the victim about rumors that the victim had recently "trad[ed] sexual favors for money" to purchase methamphetamine. The victim repeatedly denied this rumor, and an argument ensued in which the victim punched the Defendant's head. The Defendant stated that the victim usually struck him in this manner when they fought.

The Defendant testified that he attempted to block the victim's punches, and when he was unsuccessful, he grabbed the victim's waist and "pinned" her arms down to keep her from hitting him. The victim struggled to get away from the Defendant, but the Defendant told her he would not release her until she calmed down. When she stated that she had calmed, the Defendant released the victim. The victim promptly began hitting the Defendant again, so the Defendant tried to restrain her again. However, because the victim was "so short," the Defendant inadvertently wrapped his arm around the victim's neck and choked her. The Defendant testified that he promptly released the victim upon realizing that she was unable to breathe, and that this ended their fight.

The Defendant stated that he and the victim had consensual sex the next morning and later decided to visit the mall. Because the parking lot was full, the victim parked her vehicle at a nearby Red Lobster. The victim and the Defendant walked around the mall together until the victim stated that her ex-husband was bringing their son to R.O.'s

- 8 -

home. The Defendant told the victim that he did not want to visit R.O.'s home, so they parted ways. The Defendant recalled that the victim promised to return to collect him soon and that he waited for her to do so until 8:00 p.m. After concluding that the victim was not coming back for him, the Defendant called Ms. Barnett to pick him up from the mall.

On August 1, 2018, several of the Defendant's friends asked him for details regarding a "big argument" between the Defendant and the victim. The Defendant informed these friends of the rumors of the victim's "terrible drug problem" and told them "what really happened" during their stay at the Super 8 motel. The Defendant testified that he believed the victim had falsely accused him of raping her after she learned that the Defendant had "made her out to be a meth whore" and that the Defendant had been "cheating on her" with Ms. Barnett.

The Defendant reviewed Investigator Higgins' photographs of the victim's injuries. He identified redness around the victim's collarbone, which he stated was caused by her wearing a neck brace. He noted bruises on the victim's arms, which he stated were the results of a fight he and the victim had had on July 21, 2018, which the victim's stepfather had interrupted by pulling the victim away from the Defendant. He testified that the victim's legs had been bruised on July 26, 2018, when she fell and struck R.O.'s nightstand while attempting to help her into bed. The Defendant also identified "rug burn" on the victim's knees and stated that this stemmed from their having sex in the victim's vehicle.

The Defendant denied that he raped the victim. The Defendant also noted inconsistencies in the victim's allegations throughout her statement to the police, her testimony at his preliminary hearing, and her trial testimony. He specifically noted that the victim testified that the Defendant attacked her during their argument but wrote in her statement that the Defendant attacked her while she was sleeping.

On cross-examination, the Defendant stated that he wanted to mend his relationship with the victim following their argument and maintained that he still wished to do so prior to his August 3, 2018 interview. He testified that though the victim told him that she had difficulty moving her neck and that it was sore after their fight, they had consensual sex the next morning, and the victim did not protest that her neck was injured. However, as they walked around the mall, the victim began "complaining more and more." The Defendant reiterated that he did not cause the victim's injuries and maintained that she did not lose consciousness during their fight or during sex.

The Defendant rested.

### 7. The State's Rebuttal Proof

In rebuttal, the State called the victim's daughter, E.H., to testify. E.H. recalled that on July 28, 2018, she visited R.O. at her home. While there, the victim arrived "holding herself" and looking "battered up." She noted that the victim struggled to walk and stand upright and appeared to be in pain.

The State also recalled the victim to testify. The victim stated that she and her mother fought one another on July 21, 2018, and that her mother grabbed her by her wrist and "dragged" her. The victim further maintained that the bruises depicted in Investigator Higgins' photographs stemmed from her July 28, 2018, assault and rape. She denied the Defendant's assertions that her injuries had been caused by her having sex in her vehicle or from wearing a neck brace.

The State rested. Upon this proof, the jury convicted the Defendant as charged. The jury also elected to levy fines of $50,000 for the Defendant's conviction of aggravated rape and of $10,000 for his conviction of aggravated assault.

### B. Sentencing Hearing

Following the withdrawal of trial counsel and the appointment of new counsel, the trial court held a sentencing hearing on November 9, 2022. The parties agreed that the Defendant qualified as a Range I standard offender for his aggravated rape conviction and as a Range II multiple offender for his aggravated assault conviction. Following the parties' arguments, the trial court imposed midrange sentences of twenty years and eight years for the Defendant's convictions of aggravated rape and aggravated assault, respectively. See Tenn. Code Ann. §§ 39-13-502, 39-13-102, 40-35-112(a)(1), (b)(3). The trial court aligned these sentences consecutively to one another, resulting in an effective sentence of twenty-eight years' incarceration. The trial court approved the fines imposed by the jury.

The Defendant filed a timely but unsuccessful motion for new trial. This timely appeal followed.

## II. Analysis

On appeal, the Defendant argues that (1) the evidence adduced at trial was insufficient to support his conviction of aggravated rape, (2) the State committed prosecutorial misconduct during closing arguments, and (3) the trial court erred by ordering the Defendant to pay $60,000 in fines. We will address these issues in turn.

### A. Sufficiency

The Defendant first argues that the evidence adduced at trial was insufficient to support his conviction of aggravated rape. Specifically, he contends that no rational juror

could have accredited the victim's unreliable testimony, that the State failed to prove that the victim's bodily injuries stemmed from her rape or that he unlawfully penetrated the victim, and that the length of the jury's deliberations and its returning of a note stating that it was hung on the charge of aggravated rape reflects "reasonable doubt." The State responds that the evidence was sufficient.

The standard of appellate review for a defendant's challenge to the sufficiency of the convicting evidence is deferential to the jury's verdict. State v. Lyons, 669 S.W.3d 775, 791 (Tenn. 2023). This court reviews such challenges in the light most favorable to the State and if, after drawing all reasonable inferences from the evidence adduced at trial in the State's favor, it appears that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," sufficient evidence exists to support the jury's verdict. Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). "A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts [in the evidence] in favor of the prosecution's theory." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997) (citing State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973)). Thus, in reviewing the sufficiency of the evidence, this court does not reweigh the evidence or substitute its own inferences for those drawn by the trier of fact, Dorantes, 331 S.W.3d at 379, as the jury's verdict of guilty resolves "questions regarding witness credibility, the weight to be given the evidence, and factual issues raised by the evidence," State v. McKinney, 669 S.W.3d 753, 773 (Tenn. 2023) (citing State v. Majors, 318 S.W.3d 850, 867 (Tenn. 2010)). The defendant bears the burden of proving the insufficiency of the convicting evidence on appeal. State v. Thomas, 687 S.W.3d 223, 249 (Tenn. 2024) (citing State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000)).

In order to convict a defendant of the offense of aggravated rape as charged in this case, a jury must find beyond a reasonable doubt that the defendant unlawfully sexually penetrated the victim and that the defendant caused the victim bodily injury. Tenn. Code Ann. § 39-13-502(a)(2). Sexual penetration is defined as "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's the defendant's or any other person's body." Tenn. Code Ann. § 39-13-501(7). Bodily injury is defined as "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(3).

In this case, both the Defendant and the victim testified that on July 27, 2018, they reserved a room at the Super 8 motel. They further agreed that after they ate dinner and drank whiskey, an argument ensued that escalated into a physical fight. Additionally, the victim stated in her interview, wrote in her statement, and testified at trial that the Defendant initiated the fight after she attempted to leave the motel room during their argument. The victim invariably recalled losing consciousness multiple times, that the

- 11 -

Defendant choked her repeatedly, that she attempted to fight against him, that he at one point instructed her not to move because he was "not done pissing in [her] yet," and that she regained consciousness the final time lying on the floor and surrounded by her own urine and feces. The victim noted in her written statement that on one occasion in between her bouts of unconsciousness, she attempted to fight back against the Defendant but was thrown back onto the floor, where the Defendant "got back on top of [her]" and "continued screwing" her. In her trial testimony, she also noted that as she attempted to fight against the Defendant, the Defendant pressed his hands into her thighs, hit her, yelled at her to be quiet, and "continue[d] to penetrate [her]." She further testified that the Defendant was "inside" her "at some point." When the victim ultimately sought treatment at Franklin Woods Hospital, Investigator Higgins noted that she had bruises on her arms near her biceps, knees, the inside of her left thigh, and on the backside of her left leg near her buttocks and hamstrings, which Officer Richardson testified were consistent with her account of her rape and assault.

This evidence is sufficient to sustain the Defendant's conviction for aggravated rape. Though the Defendant argues that no rational juror could accredit the victim's testimony because of its inclusion of details excluded from her pretrial interview and statement, this argument was presented to the jury during the Defendant's cross-examination of the victim and his closing argument. Additionally, the victim testified that she was unable to recall specific details in the days following her rape and assault and had since undergone extensive therapy to better understand the incident. Relatedly, the Defendant further posits that the evidence is insufficient because the photographs of the victim's injuries do not detail every injury that the victim would have suffered if her testimony were true, and that inasmuch as they corroborate the victim's version of events, they could also have been the result of her assault and her previous consensual sexual encounters with the Defendant. These arguments are rooted in a theory that the victim's testimony is unreliable because of conflicting evidence. However, the job of resolving conflicts in the evidence resides with the jury, not the appellate courts. McKinney, 669 S.W.3d at 773. The jury was presented with each of these conflicts in the evidence and resolved them by accrediting the victim's testimony and convicting the Defendant. We will not disturb the jury's credibility finding on appeal. Dorantes, 331 S.W.3d at 379; see also State v. Tate, No. M2011-02128-CCA-R3-CD, 2013 WL 3964122, at *10 (Tenn. Crim. App. July 31, 2013) (rejecting a challenge to the sufficiency of the convicting evidence under the theory that the victim's trial testimony was incredible because it was more detailed than her previous statements).

Further, the State introduced sufficient proof of both the Defendant's unlawful penetration of the victim and the bodily injuries she suffered during that unlawful penetration to sustain the Defendant's conviction for aggravated rape. Though, to be sure, the victim did not state when the Defendant first penetrated her, she nevertheless recalled in her written statement and testimony that the Defendant rebuffed her attempts to escape his attacks and "continued screwing" and "continue[d] to penetrate [her]." At

trial, she agreed that the Defendant was "inside" her "at some point," and throughout all her accounts, she recalled that the Defendant told her not to move near the end of her rape because he was "not done pissing in [her] yet." Proof of even the slightest sexual penetration is sufficient to sustain a conviction of rape. See Hart v. State, 21 S.W.3d 901, 905 (Tenn. 2000) ("[T]here is . . . sexual penetration in a legal sense if there is the slightest penetration of the sexual organ of the female by the sexual organ of the male.") (internal quotation marks omitted) (citing Walker v. State, 273 S.W.2d 707, 711 (1954)). Additionally, though sexual penetration is statutorily defined, the question whether such penetration occurred is a question of fact resolved by the jury in consideration of the evidence. State v. Williams, No. M2005-00836-CCA-R3-CD, 2006 WL 3431920, at *16 (Tenn. Crim. App. Nov. 29, 2006) (citing State v. Bowles, 52 S.W.3d 69, 74 (Tenn. 2001)). Accordingly, this proof is sufficient to prove that the Defendant penetrated the victim. Moreover, the victim testified that throughout her rape, the Defendant strangled her, slammed her against the floor, punched her in the ribs, and that she lost consciousness on four occasions. She described also experiencing lasting pain in the days following her rape and assault, and every witness in this case testified that she suffered bruising. This proof is sufficient to prove her bodily injuries through bruising, physical pain, and temporary loss of her mental faculties. See Tenn. Code Ann. § 39-11-106(a)(3).

Perhaps in acknowledgment of this Court's deference to the jury's verdict in consideration of the sufficiency of the convicting evidence, the Defendant contends that "while the eventual verdicts reflect the jury's accrediting of [the victim's] version of events, the jury's deliberations and questions also reflect reasonable doubt along the way." The Defendant points to the fact that the jury began its deliberations at 10:34 a.m. and concluded them at 4:41 p.m. on August 6, 2018, after returning two notes in which it indicated it was hung on the aggravated rape charge and asking for clarification as to how to consider lesser-included offenses in its deliberation to support this claim. However, the length and duration of a jury's deliberation has no bearing on the correctness of its conclusions or the validity of its verdict. State v. Spadafina, 952 S.W.2d 444, 451 (Tenn. Crim. App. 1996) (citing Anglin v. State, 553 S.W.2d 616, 620 (Tenn. Crim. App. 1977)). Furthermore, this Court does not attempt to divine what occurred behind closed-doors during the jury's deliberations. State v. Davis, 466 S.W.3d 49, 77 (Tenn. 2015) (noting the "longstanding position of honoring and respecting a jury's verdicts" in the contest of a challenge to inconsistent verdicts). Although the jury indeed indicated that it was, at one point, hung as to the charge of aggravated rape, it later unanimously convicted the Defendant, as confirmed by the foreperson of the jury. This argument is without merit. Because the evidence in this case is sufficient to sustain the Defendant's conviction of aggravated rape, he is not entitled to relief.

**B. Improper Closing Argument**

- 13 -

The Defendant next argues that the State committed prosecutorial misconduct during closing argument by inappropriately injecting inflammatory social, emotional, and prejudicial issues broader than his guilt or innocence and by vouching for the victim's testimony. The Defendant concedes that this issue is waived for failure to object at trial or to raise the issue in his motion for new trial but nevertheless requests that this Court conduct plain error review. The State responds that plain error review is not warranted.

The Defendant challenges the following statements made by the prosecutor during closing arguments:

J-U-S-T-I-C-E. Most often we pronounce it *"just us."* There's an *"us"* in the beginning and there is an *"us"* at the end, which is the way the justice system is intended to work. Us, the accused, and us, the victim, both have rights that must be protected.

But for victims of sexual assault type crimes, the justice system is — is just as it is spelled. There is an *"us"* and there is an *"ice."* An *"us"* for the accused and a wall of *"ice"* for the victim.

Victims of sexual crimes are often blamed, ridiculed, shamed, and looked down upon. Especially when it is an acquaintance rape. The victim is put on trial whether it's an employer, a family member, a boyfriend, a spouse, a colleague.

Which would explain the reluctance to come forward and tell — relive your victimization not only to the law enforcement officers that you have to explain that to, but then to come into a courtroom and sit before 12 people and relive that, tell that in a group of people you've never met before, and then to be put on trial yourself.

Rape is a — is a physical act. But the psychological impact lasts way longer than the injure — after the injuries heal.

Justice is depicted as a lady wearing a blindfold and holding a set of scales. The blindfold represents that justice is blind, blind to race, religion, creed, sexual orientation, socioeconomic status, privilege, poverty, prior criminal history, [or] lack of prior criminal history.

The scales balance the rights of the defendant with the rights of the accused. The scales represent that the trial begins on a level playing field. We are all supposed to be on that level playing field. But it is the weight of the evidence that tip the scales from guilty — excuse me, from innocent to guilty.

- 14 -

> Justice has not always lived up to the promise. And today the State asks you to live up to justice, to set aside preconceived notions, and to restore the balance and reach a verdict based on the evidence presented before you.

In rebuttal, the State continued,

> But there are rapists in which the victim goes to work with them every day after the rape occurs. There are rapists in which the victim lays down on nights because it's their spouse. Because they don't expect them to tell any – the victim to say anything. Or if they do, who's going to believe them? "It's their word against mine."

> So those things are not indicative necessarily of innocence because an innocent person could say, "I'm not talking to the police without an attorney. Not because I did anything, but I just think it's best for me if I have an attorney present." Doesn't mean they're guilty, just means they choose to have an attorney.

> But what you heard on the stand from the victim was real and it's evidence and it's an accurate reflection of what occurred to her on July the 27th and July the 28th.

As the Defendant correctly notes, this issue is waived for his failure to raise it either at trial or in his motion for new trial. See Tenn. R. App. P. 3(e) ("[N]o issue presented for review shall be predicated upon error in the . . . misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case . . . unless the same was specifically stated in a motion for a new trial."); State v. Enix, 633 S.W.3d 692, 700-01 (Tenn. 2022) ("[A] defendant's failure to contemporaneously object to alleged prosecutorial misconduct during closing argument results in waiver on appeal."). Significantly, a contemporaneous objection provides the trial court with the opportunity to assess the allegedly improper argument and, if necessary, caution the prosecution or issue a curative instruction. State v. Jordan, 325 S.W.3d 1, 57-58 (Tenn. 2010). It further provides the State the opportunity to correct or clarify any statements which might appear to have crossed the line into impropriety.

However, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial," through plain error review. Tenn. R. App. P. 36(b). Under plain error review, relief will only be granted when all five of the following prerequisites are met:

(1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been violated; (4) the accused must not have waived the issue for tactical reasons; and (5) consideration of the error is necessary to achieve substantial justice.

State v. Rimmer, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing State v. Martin, 505 S.W.3d 492, 504 (Tenn. 2016). If any one of these factors is not satisfied, this Court need not consider the remaining factors. State v. Smith, 492 S.W.3d 224, 232 (Tenn. 2016). The Defendant bears the burden of persuasion to show that he is entitled to plain error relief. State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007). Additionally, the plain error must have been of such magnitude that it probably changed the outcome of the trial. Smith, 492 S.W.3d at 232 (citing State v. Hester, 324 S.W.3d 1, 56 (Tenn. 2010)).

"Closing arguments serve to sharpen and to clarify the issues that must be resolved in a criminal case" and enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." State v. Hawkins, 516 S.W.3d 1, 47 (Tenn. 2017) (internal quotation marks omitted) (quoting State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008)). Accordingly, our supreme court has often described closing argument as "a valuable privilege that should not be unduly restricted." State v. Reid, 164 S.W.3d 286, 320 (Tenn. 2005). That said, the trial court maintains discretion to control closing arguments, and its action in either restraining or refusing to check the parties will not be reversed on appeal absent a showing of an abuse of discretion. White v. State, 356 S.W.2d 411, 417 (1962). "The bounds of proper argument largely depend upon the facts in evidence, the character of the trial, and the conduct of opposing counsel." Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995).

In general, closing arguments must be temperate, predicated on the evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or the law. State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1997). Both the prosecution and defense counsel are equally "expected to be zealous advocates, and as a result, should be afforded great latitude in both the style and the substance of their arguments." Hawkins, 516 S.W.3d at 47 (citing Banks, 271 S.W.3d at 130-31). The prosecution's right to use colorful and forceful language is no less than defense counsel's; so long as the parties do not stray from the evidence and the reasonable inferences that may be drawn therefrom, "make derogatory remarks[,] or appeal to the jurors' prejudices," they are generally permitted considerable leeway in their oratorical emphasis. Enix, 633 S.W.3d at 701 (citing Banks, 271 S.W.3d at 131); see also Post v. State, 580 S.W.2d 801, 808 (Tenn. Crim. App. 1979). However, prosecutors "must not lose sight of their duty to seek justice impartially and their obligation to see to it that the defendant receives a fair trial." Hawkins, 516 S.W.3d at 47-48 (internal quotation marks omitted) (quoting Banks, 271 S.W.3d at 131).

This Court has recognized five general areas of prosecutorial misconduct which may arise during closing argument:

> (1) intentionally misstating the evidence or misleading the jury as to the inferences it may draw; (2) expressing personal beliefs or opinions as to the truth or falsity of any testimony or the guilt of the defendant; (3) inflaming or attempting to inflame the passions or prejudices of the jury; (4) injecting issues broader than the guilt or innocence of the accused; and (5) arguing or referring to facts outside the record unless the facts are matters of common knowledge.

State v. Jones, 568 S.W.3d 101, 145 (Tenn. 2019) (citing State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003)). As "[i]t is impossible to set out in detail what can and cannot be said in closing argument," this list is not exhaustive. Goltz, 111 S.W.3d at 6.

This Court will not overturn a defendant's conviction unless the prosecution's closing argument is so improper or inflammatory that it prejudiced the jury's verdict against the defendant. Jones, 568 S.W.3d at 145 (citing Banks, 271 S.W.3d at 131, and Reid, 164 S.W.3d at 344). As other courts have noted, the line between proper and improper closing argument is often thin, and our inquiry into whether the State crossed that line is necessarily context-specific. United States v. Moore, 651 F.3d 30, 53 (D.C. Cir. 2011) ("Because the line between permissible and impermissible arguments will not always be clear, the inquiry is necessarily contextual."); State v. Martinez, 311 Kan. 919, 923 (Kan. 2020) ("Often the line between permissible and impermissible argument is context dependent."); Kinseth v. Weil-McLain, 913 N.W.2d 55, 73 (Iowa 2018) ("Attorneys have a duty to refrain from crossing the admittedly hazy line between zealous advocacy and misconduct."). Our analysis of whether the prosecutor's statements in closing argument crossed the thin line into impermissibility is guided by the following factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the Court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984) (adopting the factors outlined in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

The Defendant contends that he is entitled to plain error review because of a clear and unequivocal breach of the law. Specifically, he contends that the State committed

prosecutorial misconduct through inappropriate and inflammatory references to victims of acquaintance rape and to the iconography of "Lady Justice," as well as by vouching for the truth of the victim's testimony. We will consider these arguments in turn.

### 1. Acquaintance Rape and "Lady Justice" References

The Defendant argues that the prosecutor's references to victims of acquaintance rape and to "Lady Justice" crossed the line into prosecutorial misconduct by impermissibly (1) inflaming the passions of the jury, (2) injecting issues broader than the Defendant's guilt or innocence, (3) asking the jurors to convict the Defendant in order to "restore the balance" of justice for sexual assault victims, (4) asking the jury to "send a message" by its verdict, (5) arguing "the need for general deterrence, and (6) urging the jury to convict the Defendant in retribution for the treatment of sexual assault victims.

We find no impropriety in the prosecutor's references to victims of acquaintance rape and their treatment by society. "In a closing argument, a prosecutor may resort to poetry, cite fiction, reference anecdotes, tell jokes, or remark on matters of general knowledge or experience although not based on record." J. Stein, Closing Arguments § 1:22 (2024-2025 ed.); see Goltz, 111 S.W.3d at 6 ("It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record *unless the facts are matters of common public knowledge*.") (emphasis added) (citing Standards Relating to the Prosecution Function and the Defense Function §§ 5.8-5.9 Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)). The reference to how victims of acquaintance rape are sometimes treated in society was a matter of common knowledge from which the jury may have permissibly drawn during its consideration of this case. State v. Brown, 795 S.W.2d 689, 696 (Tenn. Crim. App. 1990); cf. State v. McDougle, 681 S.W.2d 578, 584 (Tenn. Crim. App. 1984) (finding a reference to the dehumanizing effects of rape and its effects on a victim's self-esteem to be "generally known by common experience and understanding").

Additionally, the reference was highly relevant to the facts of the case. The victim in this case alleged that she was raped by her then-boyfriend, and the proof demonstrated that she delayed in reporting her rape and that the Defendant, by his own testimony, later spread unflattering sexual rumors about the victim following her rape. The State introduced proof that the victim feared retribution if she spoke against the Defendant and that the victim had suffered extensive mental and emotional hardships after her rape necessitating years of extensive therapy. In this context, we view the State's references to victims of acquaintance rape being "often blamed, ridiculed, shamed, and looked down upon" and reluctant to "relive [their] victimization" as highly relevant to the facts of this case, rather than an attempt to introduce issues beyond the Defendant's innocence or guilt. In light of this relevance, we also disagree with the Defendant's contention that these references served to inflame the jury's passions.

Regarding the prosecutor's references to the iconography surrounding "Lady Justice," we note that the Defendant in this case placed both the victim's credibility and her character into question during his testimony. The Defendant vehemently denied the victim's allegations and testified that she had falsely accused him of raping her after she learned that the Defendant had "made her out to be a meth whore" and that the Defendant had been "cheating on her" with Ms. Barnett. In light of these relevant issues, it is not clear that the prosecutor's references to "Lady Justice" "wearing a blindfold and holding a set of scales" were anything more than an attempt to convince the jurors to "set aside any preconceived notions" they may have held about the victim's particular situation and to instead "reach a verdict based on the evidence presented before you." See Villaneda v. Santoro, No. 2:18-CV-10485 SHK, 2021 WL 4306672, at *18 (C.D. Cal. Sept. 21, 2021), aff'd, No. 21-56160, 2023 WL 2158808 (9th Cir. Feb. 22, 2023) (finding the State's reference to "Lady Justice" during closing arguments was not improper and was intended to inform the jury that "in weighing the evidence of [the] defendant's guilt, at some point the scales may tip so far as to constitute proof beyond a reasonable doubt."); Commonwealth v. Regustors, No. 3113 EDA 2012, 2013 WL 11250378, at *7-8 (Pa. Super. Ct. Nov. 13, 2013) (finding that the statement, "Justice might be blind, but she is not dumb," was part of the State's larger attempt to explain the applicable law to the jury). Rather than imploring the jurors to convict the Defendant to "restore the balance," "send a message," or to generally deter future offenders, the prosecutor's statements when viewed in context served to ask the jurors to make a decision based on the evidence presented at trial.

## 2. Vouching for the Victim's Testimony

The Defendant also contends that the prosecutor inappropriately vouched for the victim's testimony during rebuttal argument. Our appellate courts have consistently held that it is improper for a prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence. See, e.g., State v. Sexton, 368 S.W.3d 371, 420 (Tenn. 2012); State v. Henley, 774 S.W.2d 908, 911 (Tenn. 1989); Goltz, 111 S.W.3d at 6; Lackey v. State, 578 S.W.2d 101, 107 (Tenn. Crim. App. 1978). The rationale for this prohibition, colloquially known as "vouching," is that

> Expressions by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment which should separate a lawyer from the cause for which he argues. The prohibition prevents the advocate from personally endorsing or vouching for or giving his or her own opinion; the cause should turn on the evidence, not on the standing of the advocate, and the witnesses must stand on their own.

Goltz, 111 S.W.3d at 6-7 (internal citation omitted). Further, prosecutors "should not imply special or secret knowledge of the truth or of witness credibility." ABA Criminal

Justice Standards for the Prosecution Function, Standard 3-6.8(b) (4th ed. 2017); see also Arnold v. State, No. M2018-00710-CCA-R3-PC, 2020 WL 569928, at *41 (Tenn. Crim. App. Feb. 5, 2020); State v. Agnew, No. W2016-00908-CCA-R3-CD, 2017 WL 1192117, at *9 (Tenn. Crim. App. Mar. 30, 2017).

Although expressions of personal belief or opinion are prohibited, legal argument pertaining to the truth or falsity of evidence or testimony and the credibility of witnesses is permissible if based upon evidence in the record. Sexton, 368 S.W.3d at 419-420; State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976) (holding that a prosecutor may argue against the credibility of a witness during closing arguments so long as he or she does not "go outside of the evidence" or insert personal opinion or belief into the argument). The determination as to whether a prosecutor's statement has crossed the line into impermissible vouching is necessarily contextual and is often dependent upon the specific words used. State v. Willis, 496 S.W.3d 653, 754-55 (Tenn. 2016) (citing State v. Gann, 251 S.W.3d 446, 460 (Tenn. Crim. App. 2007)). Though a prosecutor's use of predicates such as "I argue" or "I submit" before making a credibility argument may indicate that the argument is not a personalized opinion or belief, State v. Spencer, No. E2022-01276-CCA-R3-CD, 2024 WL 228412, at *22 (Tenn. Crim. App. Jan. 22, 2024), whether a challenged statement crosses the line into impermissible vouching is determined on a case-by-case basis. Compare Henley, 774 S.W.2d at 911 (improper vouching in the statement, "I thought [the witness] made one of the best witnesses I've ever seen"), State v. O'Rourke, No. M2017-00375-CCA-R3-CD, 2018 WL 4492744, at *7-8 (Tenn. Crim. App. Sept. 19, 2018) (improper vouching in the statements, "I don't know that this witness has the ability to come in here and lie to you," and "[the witness] has become my hero"), and Goltz, S.W.3d 111 at 7 (improper vouching in the statement, "I know for a fact that [the witness] is honest") with State v. Vaughn, No M2024-00028-CCA-R3-CD., 2025 WL 520172, at *13 (Tenn. Crim. App. Feb. 18, 2025) (no vouching in the prosecutor's statement that several witnesses had "demonstrated heroism" because the statement did not relate to the truth or falsity of the witnesses' testimonies), Cooper v. State, No E2022-01776-CCA-R3-PC, 2024 WL 4143828, at *43-44 (Tenn. Crim. App. Sept. 11, 2024) (no improper vouching in the prosecutor's repeated assertions that the victim was telling the truth and "didn't make [her allegations] up" because "the prosecutor was recounting the precise details of these offenses as they were relayed by the victim" and stressed that the jury was the "ultimate deciders of who's telling the truth"), and State v. Agnew, No. W2016-00908-CCA-R3-CD, 2017 WL 1192117, at *9 (Tenn. Crim. App. Mar. 30, 2017) (no vouching in the statement, "I submit to you that [the witnesses] were telling you the truth about what they witnessed on that morning" and "their testimony corroborates what [other witnesses] told you" in the context of the State's larger argument regarding credibility and corroboration based on proof that most of the witnesses did not know each other).

In this case, the Defendant argues the prosecutor impermissibly vouched for the victim's testimony by stating, "[W]hat you heard on the stand from the victim was real

and it's evidence and it's an accurate reflection of what occurred to her on July the 27th and July the 28th." We disagree. Throughout the Defendant's brief, he maintains that this case is a "he-said, she-said" case hinging on whether the jury accredited the victim's testimony. During his own closing argument, the Defendant presented this same claim and noted that the central question was "Who's telling the truth?" The Defendant further attacked the truth and credibility of the victim's testimony during closing argument by contending that the victim's injuries were from unrelated events, that her trial testimony did not match her pretrial statements, and that the jury should instead accredit the Defendant's testimony that no rape occurred. In response to this attack on the credibility of the victim's testimony, the State responded by asserting that the victim's testimony was "real," "evidence," and "an accurate reflection of what occurred to her."

When viewed in context, the prosecutor's statements do not appear to be a statement of her own belief in the victim's credibility but rather an argument based on the proof that the jury should accredit the victim's testimony. Though the Defendant targets the words "real," "evidence," and "accurate" as impermissible, we reiterate that the determination of whether a prosecutor crosses the line into impermissible closing argument is highly contextual. In this case, words "real" and "evidence" referred to the fact that the victim's testimony was sworn, as opposed to her unsworn statements and interview. The challenged statements further came in the midst of the prosecution's larger response to the Defendant's credibility arguments; the prosecutor also noted that any inconsistencies in the victim's pretrial statements and interview were likely due to the shock she was facing following her rape and assault and illustrated differences between the Defendant's testimony and the victim's. Therefore, the prosecutor's statements served as responses to the Defendant's closing arguments challenging the victim's credibility. See Spencer, 2024 WL 228412, at *22 ("Despite the theme in the rebuttal closing argument that the victim was credible and that the [d]efendant was not credible, the prosecutor's arguments were focused on explaining why the jury should credit the victim's testimony and discredit the [d]efendant's statements."). Moreover, the prosecutor's statements did not imply that she had some secret knowledge of the veracity of the victim's testimony or that other evidence not available to the jury supported her argument. Lackey, 578 S.W.2d at 107 (finding impermissible vouching in the prosecutor's statement "I won't tell you why I don't believe [the witness]"). Accordingly, we discern no impropriety in this aspect of the prosecutor's closing argument.

We also note that the trial court issued an instruction to the jury that "[s]tatements, arguments, and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." The trial court later reminded the jury that it was the "exclusive judge of the credibility of the witnesses and the weight to be given to their testimony." Even assuming that the prosecutor's references to victims of acquaintance rape and "Lady Justice" or her

statements regarding the victim's testimony stepped over the thin line into impermissible closing arguments, the jury is presumed to follow the trial court's instructions. State v. Young, 196 S.W.3d 85, 111 (Tenn. 2006); see also Jordan, 325 S.W.3d at 66 (finding no prejudice in the prosecutor's improper references to the "angel of death" in part due to the trial court's issuing of similar jury instructions).

More importantly, the question to be answered under plain error review in this case is whether the prosecutor's comments *clearly* crossed the line into impermissible argument. Smith, 24 S.W.3d at 282. In this case, we cannot agree that they did so. Because the Defendant has failed to establish a clear and unequivocal breach of the law, we need not consider whether the remaining factors warrant plain error review. The Defendant is not entitled to relief on this issue.

## C. Fines

Finally, the Defendant argues that the trial court failed to make sufficient findings to support its imposition of $60,000 in fines and failed to consider his indigency. The State responds that the record supports the trial court's imposition of the fines.

The jury is responsible for setting fines within the appropriate ranges prescribed by the legislature when it convicts a defendant of an offense punishable by a fine in excess of fifty dollars. Tenn. Const. art. VI, § 14; Tenn. Code Ann. § 40-35-301(b). Following the defendant's sentencing hearing, the trial court "shall impose a fine, if any, not to exceed the fine fixed by the jury." Tenn. Code Ann. § 40-35-301(b). The trial court's imposition of a fine must be based on its consideration of the defendant's "prior history, potential for rehabilitation, financial means, and mitigating and enhancing factors that are relevant to an appropriate, overall sentence." State v. Taylor, 70 S.W.3d 717, 723 (Tenn. 2002) (citing State v. Blevins, 968 S.W.2d 888, 895 (Tenn. Crim. App. 1997)). The trial court must also consider the factors provided by the statutory sentencing act. Taylor, 70 S.W.3d at 723. Though the trial court must consider the defendant's ability to pay the fine imposed, that factor alone is not controlling. State v. Butler, 108 S.W.3d 845, 854 (Tenn. 2003). As fines are affixed as part of a Defendant's sentence, we review any fines imposed by the trial court under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012).

In this case, the jury found the Defendant guilty of aggravated rape, a Class A felony, and aggravated assault, a Class C felony, and imposed maximum fines of $50,000 and $10,000, respectively. See Tenn. Code Ann. §§ 39-13-502, -102, 40-35-111(b). Following the Defendant's sentencing hearing, the trial court noted that the jury imposed these fines before informing the victim of when she could expect the Defendant to be released from confinement. The trial court then provided the Defendant a summary of his sentence, noting his substantial pretrial jail credits. The trial court then stated, "I will

not disturb the fine that was imposed by the jury. They clearly imposed the maximum fine possible for these crimes."

Our review of the record indicates that the trial court made no findings to support its imposition of maximum fines. Though, as the State notes, the trial court considered the Defendant's criminal record, his potential for rehabilitation, and the applicable mitigating and enhancement factors, it did so in the context of determining the length of the Defendant's sentence and whether consecutive sentencing was warranted, not in consideration of whether fines were warranted. See State v. Climer, No. W2024-00023-CCA-R3-CD, 2024 WL 4948973, at *6 (Tenn. Crim. App. Dec. 3, 2024) ("While the trial court made thorough findings supporting its decision to deny alternative sentencing, the trial court simply announced the fine with[out] making any findings justifying the same."). Indeed, the trial court made detailed and specific findings which support the other aspects of its sentencing decision but only referenced the issue of fines in passing. In the absence of the requisite findings to support its imposition of fines, this aspect of the trial court's sentencing determination is not entitled to deference or a presumption of reasonableness on appeal. State v. Pollard, 432 S.W.3d 851, 863-64 (Tenn. 2013); State v. Jackson, No. W2021-00208-CCA-R3-CD, 2022 WL 370090, at *5 (Tenn. Crim. App. Feb. 8, 2022). When the trial court fails to place on the record *any* reasoning to support its sentencing decision, the most appropriate remedy is to remand the case to the trial court for reconsideration. Bise, 380 S.W.3d at 705, n.41. Therefore, we reverse the trial court's sentencing decision only insofar as it relates to the imposition of fines. On remand, the trial court shall conduct a new sentencing hearing to consider the relevant factors, including the Defendant's financial means, and make the necessary findings in consideration of those factors.

## III. Conclusion

Following our review, we reverse the trial court's imposition of fines and remand for a new sentencing hearing consistent with this opinion. The judgments of the trial court are otherwise affirmed.

s/ W. MARK WARD
W. MARK WARD, SPECIAL JUDGE

- 23 -